Andrew Hursh (Montana Bar # 68127109)
Bryan Hurlbutt (Idaho Bar # 8501) (*pro hac vice* pending)
ADVOCATES FOR THE WEST
966 Discovery Way
Missoula, MT 59802
(208) 342-7024 (Hursh)
(208) 730-6961 (Hurlbutt)
ahursh@advocateswest.org
bhurlbutt@advocateswest.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| WILDEARTH GUARDIANS and WESTERN WATERSHEDS PROJECT, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. FISH AND WILDLIFE SERVICE, <br><br> *Defendant*. | Case No. _____ <br><br><br> **COMPLAINT** |

# INTRODUCTION

1.      Plaintiffs WildEarth Guardians and Western Watersheds Project file this case to challenge Defendant U.S. Fish and Wildlife Service's ("FWS" or "the Service") issuance of five Cooperative Agriculture Agreements ("CAAs") and commercial Special Use Permits ("SUPs"), and other related actions, authorizing commercial cattle grazing on public lands at the Red Rock Lakes National Wildlife Refuge in southwest Montana's Centennial Valley.

2.      President Franklin D. Roosevelt established Red Rock Lakes National Wildlife Refuge (the "Refuge" or "Red Rock Lakes NWR") in 1935 "as a refuge and breeding ground for wild birds and animals." The Refuge is the largest wetland system in the Greater Yellowstone Ecosystem and is described by FWS as "one of the most naturally diverse areas in the Refuge System" nationwide. As with all national wildlife refuges, FWS must manage Red Rock Lakes NWR for the primary purpose of wildlife and ecological conservation and rehabilitation.

3.      In the 1960s, FWS determined that livestock grazing conflicted with the Refuge's purposes, so the agency scaled back the authorized amount of grazing there. In 1994, FWS took public comment, studied the environmental impacts of different grazing alternatives, and concluded that grazing—even at lower levels allowed since the 1960s—posed threats to the Refuge. FWS then decided to allow grazing to continue at those lower levels, but *only* when accompanied by consistent

monitoring, studies, and adaptation of the grazing program to ensure compatibility with the Refuge's values and statutory requirements.

4.     Since 1994, however, FWS has continued authorizing grazing without conducting the promised monitoring and studies and without making the requisite determinations that grazing is necessary to benefit wildlife. Most recently, in 2023, FWS authorized grazing at the Refuge by issuing CAAs and SUPs to five grazing operators for five-year terms, and by issuing a grazing Compatibility Determination, but still without following through on its prior commitments to protect the Refuge from the adverse impacts of grazing. FWS also issued an Environmental Action Statement, asserting that its nearly 30-year-old environmental analysis from 1994 was sufficient to support grazing in 2023.

5.     Plaintiffs challenge FWS's actions in 2023 issuing the five CAAs and SUPs, the Compatibility Determination, and the Environmental Action Statement. These actions violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the National Wildlife Refuge System Improvement Act ("Refuge Act"), 16 U.S.C. § 668dd *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; and regulations adopted under these statutes. Plaintiffs also challenge FWS's failure to prepare an environmental impact statement ("EIS") to study the potentially significant environmental impacts of livestock grazing, in violation of NEPA and NEPA regulations.

## JURISDICTION & VENUE

6.    Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq.*; the Refuge Act, 16 U.S.C. § 668dd *et seq.*; NEPA, 42 U.S.C. § 4321 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*

7.    An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–06.

8.    Venue is proper in this Court under 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to Plaintiffs' causes of action occurred, are occurring, and will occur in the District of Montana.

9.    The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. §§ 702 and 704.

10.    Plaintiffs have exhausted all administrative remedies and satisfied all other conditions precedent to bringing this suit.

## PARTIES

11.    Plaintiff WILDEARTH GUARDIANS is a nonprofit conservation organization with offices in Montana and five other states. WildEarth Guardians has more than 179,000 members and supporters across the United States and the

world. WildEarth Guardians advocates for the protection and restoration of wildlife, wild places, wild rivers, and the health of the American West. For three decades, WildEarth Guardians has worked to protect wild places and wildlife from harmful impacts of livestock grazing. WildEarth Guardians values the proper and lawful management of national wildlife refuges to conserve, manage, and restore wildlife, fish, and their habitats.

12.    Plaintiff WESTERN WATERSHEDS PROJECT is a nonprofit conservation organization headquartered in Hailey, Idaho. Western Watersheds Project has more than 14,000 members and supporters. Western Watersheds Project is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. Western Watersheds Project, as an organization and on behalf of its members, is concerned with and active in seeking to protect and restore wildlife, riparian areas, water quality, and other natural resources and ecological values of watersheds throughout the West.

13.    The management of the Red Rock Lakes NWR and protecting it from harmful impacts of livestock grazing is of great concern to WildEarth Guardians and Western Watersheds Project. Plaintiffs have worked to protect Red Rock Lakes NWR from harmful impacts of livestock grazing, including by submitting letters and comments to Defendant FWS concerning the issuance of the CAAs and SUPs for grazing there.

14.    Plaintiffs have members, staff, and supporters who regularly visit and/or recreate on and adjacent to the Red Rock Lakes NWR. Plaintiffs' members, supporters, and staff derive recreational, aesthetic, scientific, inspirational, educational, and other benefits from their visits to and use of the NWR and adjacent areas, and they plan to continue these visits and use in the future. Livestock grazing prevents them from visiting and using the NWR and adjacent areas and adversely impacts their activities when they do occur. Plaintiffs' members, supporters, and staff are likely to avoid spending time in areas that are being or have been grazed due to the presence of cattle, cattle manure, and cattle fencing, and the degradation they cause to water quality, fish, wildlife, plant life, insect life, and wilderness. These are actual, concrete injuries caused by Defendant's violations of law, and the relief sought herein would remedy, at least in part, these injuries.

15.    Plaintiffs and their members, supporters, and staff are also directly injured by Defendant's continued authorization of livestock grazing at Red Rock Lakes NWR without properly evaluating and disclosing the environmental impacts of and alternatives to this activity. Plaintiffs and their members, supporters, and staff have a strong procedural interest in ensuring Defendant complies with all applicable federal statutes and regulations. Plaintiffs have worked to reform Defendant's management of NWRs, including to restrict or better manage

livestock grazing, and have a strong interest in ensuring Defendant gathers and discloses to the public specific information about the environmental impacts of the grazing in Red Rock Lakes NWR.

16.    Defendant's violations of law have injured and will injure the aesthetic, commercial, conservation, scientific, recreational, educational, wildlife preservation, procedural, and other interests of Plaintiffs and their members, supporters, and staff. These are actual, concrete injuries caused by Defendant's violations of law, and the relief sought herein would redress these injuries. Plaintiffs have no adequate remedy at law, and thus the requested relief is appropriate.

17.    Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency that is part of the Department of the Interior. Defendant is responsible for managing the Red Rock Lakes NWR. Defendant took the actions which are the subject of this lawsuit.

## LEGAL BACKGROUND

**The Refuge Act**

18.    Each refuge in the National Wildlife Refuge System must be managed to fulfill the purpose of the National Wildlife Refuge System Improvement Act ("Refuge Act") as well as the specific purposes for which each refuge was established. 16 U.S.C. § 668dd(a)(3)(A). The purpose of the Refuge Act is "to

administer a national network of lands and waters for the conservation,

management, and where appropriate, restoration of the fish, wildlife, and plant

resources and their habitats within the United States." *Id.* § 668dd(a)(2). Purposes

of a specific refuge within the System are those "derived from the law,

proclamation, executive order," or other means of establishing or expanding a

refuge. *Id.* § 668ee(10).

19.    "All national wildlife refuges are maintained for the primary purpose

of developing a national program of wildlife and ecological conservation and

rehabilitation." 50 C.F.R § 25.11(b). "These refuges are established for the

restoration, preservation, development and management of wildlife and wildlands

habitat; for the protection and preservation of endangered or threatened species and

their habitat; and for the management of wildlife and wildlands to obtain the

maximum benefits from these resources." *Id.*

20.    The Red Rock Lakes NWR was established by executive order on

April 22, 1935, "as a refuge and breeding ground for wild birds and animals and in

order to effectuate further the purposes of the Migratory Bird Conservation Act."

Executive Order 7023 (1935), p. 1. The Executive Order creating Red Rock Lakes

NWR does not include any allowance for other, non-wildlife uses of the NWR. *See*

Executive Order 7023.

21.     The Refuge Act requires FWS to prepare a management plan, referred
to as a comprehensive conservation plan ("CCP"), for each refuge. 16 U.S.C.
§ 668dd(e)(1)(A), (B). FWS is required to revise the CCP as may be necessary
"not less frequently than 15 years after the date of issuance . . . and every 15 years
thereafter." 16 U.S.C. § 668dd(e)(1)(A)(iv). A CCP "describes the desired future
conditions of a refuge . . . and provides long-range guidance and management
direction to achieve the purposes of the refuge." 50 C.F.R. § 25.12. The CCP also
"maintains and, where appropriate, restores the ecological integrity of each
refuge." *Id.* The Refuge Act mandates that FWS "shall manage the refuge . . . in a
manner consistent with the plan." *Id.* § 668dd(e)(1)(E).

22.     The Refuge Act also mandates that FWS shall not allow any use of a
refuge "unless [FWS] has determined that the use is a compatible use." 16 U.S.C.
§ 668dd(d)(3)(A); 50 C.F.R. § 25.21(b) (FWS "may open a national wildlife refuge
for any refuge use, or expand, renew, or extend an existing refuge use only after
the Refuge Manager determines that it is a compatible use and not inconsistent
with any applicable law.").

23.     A "compatible use" is any use of a refuge that, based on "sound
professional judgment, will not materially interfere with or detract from the
fulfillment of the National Wildlife Refuge System mission or the purpose(s) of the
national wildlife refuge." 50 C.F.R § 25.12; *see also* 16 U.S.C. § 668ee(1). Sound

professional judgment means "a finding, determination, or decision that is consistent with the principles of sound fish and wildlife management and administration, available science and resources, and adherence to the requirements of the [Refuge] Act and other applicable laws." 16 U.S.C. § 668ee(3).

24.    In making a compatibility determination, FWS must consider the anticipated impacts of the use on the refuge's purpose and on the conservation mission of the National Wildlife Refuge System. *Id.* § 26.41(a)(8). FWS must consider direct impacts of the use, indirect impacts associated with the use, and cumulative impacts including "uses of adjacent lands or waters that may exacerbate the effects of the refuge use." U.S. Fish and Wildlife Service Manual, 603 FW §§ 2.11(B)(3), 2.12(A)(8)(c). FWS must "[d]escribe the specific areas of the refuge that will be used: habitat types and acres involved [and] key fish, wildlife, and plants that occur in or use that habitat." 603 FW § 2.12(A)(6)(b).

25.    Uses that are reasonably anticipated "to reduce the quality or quantity or fragment habitats on a national wildlife refuge will not be compatible." *Id.* § 2.5(A). When a use is not compatible, FWS must eliminate or modify the use as expeditiously as practicable. 16 U.S.C. § 668dd(d)(3) (B)(vi); 50 C.F.R. § 26.41(d).

26.     FWS's Manual directs that if a proposed "use cannot be modified with stipulations sufficient to ensure compatibility, the use cannot be allowed." 603 FW § 2.12(A)(11)(a). Further:

> Protective stipulations in the compatibility determination for a particular use should specify the manner in which the use must be carried out to ensure compatibility. Stipulations must be detailed and specific. . . . Monitoring of the use must be sufficient to evaluate compliance with stated conditions and swift action must be taken to correct or respond to any serious deviations.

*Id.* § 2.12(A)(11)(b).

27.     FWS may authorize a public or private economic use of a refuge only if it is compatible *and* "contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." 50 C.F.R. § 29.1. Livestock grazing is a private economic use. *Id.* "Permits for economic use will contain such terms and conditions that [FWS] determine[s] to be necessary for proper administration of the resources." *Id.*

28.     To ensure that a use that is not a wildlife-dependent recreation use remains a compatible use, reevaluation of the existing use is required whenever conditions change significantly or significant new information regarding the use's effects arises, "but not less frequently than once every 10 years[.]" 16 U.S.C. § 668dd(d)(3)(B)(vii); 50 C.F.R. § 25.21(g). When FWS re-evaluates a use for compatibility, it "will take a fresh look at the use and prepare a new compatibility

determination following the procedures outlined in 50 CFR 26.41." 50 C.F.R. § 25.21(i).

29.    When authorizing economic activity like livestock grazing on refuge lands, FWS enters into Cooperative Agriculture Agreements ("CAAs") with operators. The agency describes CAAs as the "legal instruments" that "transfer[] a thing of value (use of NWRS property) from the Service to the other party to carry out a public purpose of support or stimulation[.]" 620 FW § 2.4(B). The CAA "describes the objectives, roles, responsibilities, terms, conditions of cooperative agriculture on NWRS land." 620 FW § 2.4(D).

30.    The CAAs for livestock grazing at the Refuge also include the issuance of commercial SUPs, as well as other documents describing details such as plans of operation, annual work plans, and special conditions.

**The National Environmental Policy Act**

31.    NEPA is our nation's basic charter for protection of the environment. If a major federal action may have significant impacts, an agency must prepare an environmental impact statement ("EIS"). 42 U.S.C. §§ 4321, 4332(2)(C).

32.    The Council on Environmental Quality ("CEQ") has adopted NEPA regulations, which "are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed

decision making by Federal agencies." 40 C.F.R. § 1500.1(b).[1] CEQ's NEPA

regulations are binding on all federal agencies. *See* 40 C.F.R. §§ 1500.3(a), 1507.1.

33.    FWS is a bureau within the U.S. Department of the Interior

("Interior"), which has also adopted NEPA regulations. *See* 43 C.F.R. § 46.10 *et*

*seq.*

34.    CEQ regulations require that agencies shall "[i]dentify environmental

effects and values in adequate detail so the decision maker can appropriately

consider such effects and values alongside economic and technical analyses." 40

C.F.R. § 1501.2(b)(2). Agencies should consider short-term and long-term effects,

and beneficial and adverse effects. *Id.* § 1501.3(b)(2). "Effects or impacts means

changes to the human environment from the proposed action or alternatives that

are reasonably foreseeable. . . ." *Id.* § 1508.1(g). Effects or impacts include direct

effects, indirect effects, and cumulative effects. *Id.* § 1508.1(g)(1)–(3). Cumulative

effects "result from the incremental effects of the action when added to the effects

of other past, present, and reasonably foreseeable actions" regardless of the agency

or person undertaking them. *Id.* § 1508.1(g)(3). "Cumulative effects can result

from individually minor but collectively significant actions taking place over a

---

[1] CEQ recently amended its NEPA regulations, effective July 1, 2024. 89 Fed. Reg.
35442 (May 1, 2024). This Complaint cites to the CEQ NEPA regulations as last
amended in July 2020, which applied at the time of the FWS actions relevant here.

period of time." *Id.* "Effects include ecological . . . , aesthetic, historic, cultural, economic, social, or health . . ." effects. *Id.* § 1508.1(g)(4).

35.    Under CEQ regulations, if the significance of effects is unknown, an agency may prepare an environmental assessment ("EA") to consider whether an action may have any significant environmental impact requiring an EIS. *See* 40 C.F.R. §§ 1501.5(a), (c), 1508.1(h). An agency can avoid preparing an EIS only if it determines based on the EA that the proposed action "will not have significant effects," in which case it shall prepare a "finding of no significant impact" ("FONSI"). *Id.* § 1501.6(a).

36.    Similarly, Interior regulations state that FWS "must prepare" an EIS "for each proposed major Federal action significantly affecting the quality of the human environment before making a decision on whether to proceed with the proposed action." 43 C.F.R. § 46.400.

37.    CEQ regulations provide that in a FONSI, an agency must "briefly present[] the reasons why an action . . . will not have a significant effect." 40 C.F.R. § 1508.1(l).

> The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant effects.

*Id.* § 1501.6(c). "Mitigation means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects." *Id.* § 1508.1(s).

38.    Interior regulations also allow preparation of an EA "to determine whether to prepare an environmental impact statement or a finding of no significant impact." 43 C.F.R. § 46.300. FWS "must ensure that an environmental assessment is prepared for all proposed Federal actions, except those:" (1) covered by a categorical exclusion; (2) "covered sufficiently by an earlier environmental document as determined and documented by the Responsible Official"; or (3) for which an EIS will be prepared. *Id.* § 46.300(a). The EA process concludes with: (1) a notice of intent to prepare an EIS; (2) a FONSI; or (3) a result that no further action is taken on the proposal. *Id.* § 46.325.

39.    CEQ regulations allow new actions to be covered by an existing environmental assessment only "[i]f the actions covered by the original environmental assessment and the proposed action are substantially the same." 40 C.F.R. § 1506.3(c).

40.    Interior regulations provide that an existing environmental analysis "may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the

environmental effects of the proposed action and reasonable alternatives." 43

C.F.R. § 46.120(c). "The supporting record must include an evaluation of whether

new circumstances, new information or changes in the action or its impacts not

previously analyzed may result in significantly different environmental effects." *Id.*

**The Administrative Procedure Act**

41.    Under the Administrative Procedure Act, a reviewing court "shall

hold unlawful and set aside agency action, findings, and conclusions found to be

. . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

**Red Rock Lakes NWR**

42.    The 53,418-acre Red Rock Lakes National Wildlife Refuge is one of

the most diverse wildlife refuges in the United States. The Refuge is located in

Beaverhead County, Montana, in the Centennial Valley, which is a high-elevation

intermontane basin drained by the Red Rock River, a tributary to the Beaverhead

River and ultimately the Missouri River.

43.    Red Rock Lakes NWR includes 25,000 acres of wetlands, rivers,

streams, and three lakes. The Refuge is located in the middle of an important

wildlife corridor linking the Greater Yellowstone and Bitterroot ecosystems. The

Refuge contains 32,350 acres designated as Wilderness in 1976 to be managed

under the requirements of the Wilderness Act of 1964. In total, the Refuge protects

over 69,000 acres of the remote and undeveloped Centennial Valley, including

20,000 acres of Refuge-managed conservation easements.

**Fig. 1 – Map of Red Rock Lakes NWR**
(available at https://www.fws.gov/media/red-rock-lakes-nwr-hunt-fish-
public-use-regulations)



44.     Visitor opportunities at the Refuge include hunting, wildlife

observation, photography, canoeing and kayaking, camping, environmental

education, and interpretation. The annual number of visits to the Refuge in 2009

was estimated at 12,000. In 2020, Red Rock and Odell creeks supported

approximately 1,935 angler days.

45.    Red Rock Lakes NWR plays an integral role in trumpeter swan

conservation and provides critical nesting, breeding, and resting areas for other

migratory birds. It offers habitat for one of the last known endemic adfluvial

populations of Arctic grayling in the contiguous United States. It also supports

sage-grouse, gray wolves, grizzly bears, and other native carnivores.

46.    To achieve the Refuge's purpose, FWS selected nine "target species"

for each of three habitats at the Refuge. Each has been identified as a species of

"conservation concern," and each uses specific Refuge habitats during breeding

and migration. Wet meadow habitat target species are northern pintail, long-billed

curlew, sandhill crane, short-eared owl, and greater sage-grouse. Grassland target

species are Swainson's hawk and Ferruginous hawk. Shrub-steppe target species

are Brewer's sparrow and sage-grouse. FWS focuses on these species to "ensure

diverse and productive habitats for target species and other native wildlife," to

"direct management actions for the greatest benefit of trust species," to "manage

habitat and gauge response," and to further the "development of objectives that

will guide management to meet target wildlife species habitat needs."

47.    FWS has identified Arctic grayling at the Refuge as having high

conservation value but has determined that they have lost genetic diversity and are

at risk of extirpation due to their critically low population. FWS has also determined that Arctic grayling habitat at Red Rock Lakes NWR "is critically important to the continued existence of the population, which has undergone significant declines in abundance in recent years."

48.     Historically, Arctic grayling spawned in numerous tributaries of Lower and Upper Red Rock lakes. Today, spawning occurs only in Odell and Red Rock Creeks. Grayling spawn in Red Rock Creek and spend the non-breeding part of the year in Upper Red Rock Lake. A number of adult grayling spend the summer in Red Rock and Odell Creeks, where some are caught by anglers.

49.     FWS recognizes that grazing has taken a toll on riparian systems at the Refuge, including degradation of woody riparian vegetation and increased fine sediments in the streambed, summer water temperatures, and nutrient levels. Grazing and the introduction of nonnative grasses in riparian areas at the Refuge led to the replacement of deep-rooted native willows, sedges, and grasses by shallow-rooted species, which in turn resulted in streambank erosion, over-widened channels, decreased pool habitat, and increased water temperatures.

50.     Grazing-caused sedimentation was reported as the primary threat to grayling persistence for much of the 1900s. Grazing-caused sedimentation has been repeatedly documented in Red Rock, Odell, and Tom creeks in grayling spawning reaches. Extensive grazing in the Centennial Valley resulted in excessive

siltation, which contributed to reduced maximum depths in Upper Red Rock Lake estimated to range from over 20 feet historically to less than six feet today. A combination of Refuge land acquisition, changes in grazing management on public and private lands, and restoration projects in more recent years have reduced, but not eliminated, these adverse impacts to riparian systems and grayling.

51.    Grizzly bears also use the Refuge. For example, from April through October, grizzly bears, including sows with cubs, use the shore of Upper Red Rock Lake, which appears to be a focal area for feeding after emerging from hibernation. Grizzly bears are protected as a "threatened" species under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*

52.    FWS first listed the grizzly bear under the ESA in 1967. *See* 32 Fed. Reg. 4001 (Mar. 11, 1967). At that time, the species had been extirpated from about 98 percent of its historic range in the lower 48 states. At the time of listing, FWS identified the Greater Yellowstone Ecosystem ("GYE") recovery area, which is adjacent to and generally east of the Refuge, as the bears' minimal occupied habitat. Since listing, grizzly bear populations and occupied habitat have increased, including in the Centennial Valley and at the Refuge.

53.    In recent years, areas like Red Rock Lakes NWR have served as important grizzly bear habitat, including as a corridor for bears to move between the GYE and other recovery areas FWS has identified in Idaho and Montana. FWS

has recognized that grizzly bears need connectivity to avoid genetic isolation and that avoiding genetic isolation is key to the species' long-term survival.

54.    The leading cause of grizzly bear mortality outside the GYE Demographic Monitoring Area is lethal management in response to livestock-grizzly conflicts. These conflicts are responsible for 39 percent of such grizzly deaths. In the 2023 annual report on grizzly bear depredations and lethal removals in the Beaverhead-Deerlodge National Forest, the Forest Service found 24 depredation events and two instances of lethal removals. These two lethal removals and a majority of these depredation events occurred in the Gravelly Mountains, which are just north of the Refuge. The increased presence of grizzly bears around the Refuge has increased the risk of conflict there.

55.    Another species that depends upon the Refuge is the greater sage-grouse. The sage-grouse is one of FWS's target species at the Refuge. FWS researchers have noted that the sagebrush biome upon which this species relies is one of the "most imperiled major ecosystems in the United States . . . reduced to half of its historical extent due to fragmentation and conversion for livestock forage" and other land uses. Sage-grouse populations have declined precipitously in parallel with damage to such habitats.

56.    In 2010, FWS found that listing sage-grouse under the ESA was "warranted but precluded" by other higher-priority actions. Since then, federal and

state efforts have occurred to identify and protect key sage-grouse habitats. The Refuge is located within a designated "core area" for sage-grouse, which is one of only two core areas in southwest Montana. Core areas in Montana are habitats associated with the highest densities of sage-grouse and/or sage-grouse lek (mating site) complexes and associated habitat important to sage-grouse distribution.

57.    Livestock grazing and associated infrastructure and management activities can harm sage-grouse and degrade sage-grouse habitat in a variety of ways. Livestock graze and trample vegetation that sage-grouse use for food and cover. Livestock also facilitate the conversation of native vegetation communities to communities dominated by non-native species. And livestock operations create the need for infrastructure like fences that serve as perches for sage-grouse predators and cause mortality of sage-grouse through collisions. Removal of herbaceous vegetation in nesting and brood-rearing habitat is one of the most detrimental impacts of livestock grazing.

58.    At the Refuge, FWS researchers have documented how the "intricate networks of linear and point features" accompanying livestock grazing—namely, fencing and cattle paths—can lead to negative effects for greater sage-grouse due to maladaptive responses in nesting behavior. FWS also found grazing modified the Refuge in ways that impacts sage-grouse nest site selection and survival.

59.     The Centennial Valley has become significantly warmer and drier over the past 75 years. Climate change and warming are expected to affect a variety of natural processes and resources in the future. At the Refuge, FWS has said that a warming climate could harm grayling by increasing water temperatures, and could cause earlier bird migration patterns, increased frequency of wildfire, increased habitat conversion, and decreased water availability. Freshwater ecosystems are generally the most sensitive to deviations in global temperatures and resulting shifts in habitat conditions.

60.     Studies from 1996, 2009, and 2015 show that climate change has reduced annual precipitation and snowpack levels, diminished the magnitude of spring runoff, and increased water temperatures in Montana. Studies from 2016 and 2022 show that decreased precipitation and snowpack in the Centennial Valley led to lower water depths and increased retention times in Upper Red Rock Lake, which contributed to reduced amount of suitable overwinter habitat for grayling.

61.     Invasive species have also changed the Refuge. Nonnative plants can invade and spread throughout rangelands easily due to frequent openings in plant cover, high light levels, and human activities that transport weeds. FWS uses livestock grazing to try to keep some types of non-native grasses in check. However, livestock are also known to distribute non-native plants, such as when livestock defecate viable seeds or transport seeds attached to their hair.

**Overview of Livestock Grazing Authorized at the Refuge**

62.    When Red Rock Lakes NWR was established in 1935, FWS discontinued cattle grazing because overgrazing was threatening the Refuge's ecological values. Subsequently, FWS renewed grazing on the premise that it might alleviate perceived hazards from fire and rodents at the Refuge. But overgrazing occurred again, and in 1968, FWS reduced the amount of grazing authorized.

63.    FWS currently authorizes commercial permit-holders to graze cattle in the Refuge on the premise that the livestock are a "tool" to "manage" wet meadow, grassland, and shrub-steppe habitats, including purportedly to mimic some behaviors and grazing habits of bison, which were present on the Refuge around the mid-1800s, and to reduce wildfire risk and combat invasive plants.

64.    FWS authorizes grazing on 26 sub-units in the Refuge. These consist of approximately 7,491 acres of wet meadow, 14,005 acres of grassland, and 6,581 acres of shrub-steppe. Grazing also occurs on 7 sub-units the Refuge leases from the State of Montana, which include 190 acres of wet meadow, 3,140 acres of grassland, and 4,898 acres of sagebrush-steppe. Nineteen of the Refuge's grazing sub-units overlap designated Wilderness.

65.    Since the mid-1990s, grazing rates have ranged from 0.31 to 0.85 animal unit months (AUMs) per acre, with an average of 4,165 AUMs used

annually. An AUM is the amount of forage needed by an "animal unit" (AU)

grazing for one month. The animal unit is defined as one mature 1,000-pound cow

and her suckling calf. Grazing typically begins in early- to mid-summer and

continues until October 1 each year.

**Fig. 2 – 2014 Map of Red Rock Lakes Grazing Units, Fences, and Wilderness**
(From Davis & Cutting, *Red Rock Lakes National Wildlife Refuge, Habitat Management Plan for Grazing* (2014)



66.    As depicted on the map above, the implementation of livestock

grazing on the Refuge has resulted in the extensive construction and maintenance

of fences, including within designated Wilderness.

**The 1994 Environmental Assessment & Finding of No Significant Impact**

67.    In July 1994, FWS issued the Final Environmental Assessment, Red Rock Lakes National Wildlife Refuge Management of Upland Habitats (the "1994 EA"). The 1994 EA was prepared to consider whether to continue allowing livestock grazing at the Refuge, and if so, under what conditions. The 1994 EA evaluated multiple alternatives, including: no action; no grazing; grazing by native animals only; increased livestock grazing; and livestock grazing using adaptive management by prescription.

68.    In the 1994 EA, FWS found that grazing can have adverse environmental impacts and can conflict with the purposes for which the Refuge was established. In its summary of Alternative A, "No Action - Continue the Present Management Program Alternative," FWS stated: "Although grazing has been substantially reduced from historical levels . . . , negative impacts or long term plant species changes can still occur. In the long-term, the purposes of the Refuge would not be achieved."

69.    FWS also noted: "The Refuge is interlaced with several miles of major creeks and streams to smaller brooks. . . . Riparian areas have substantial value for wildlife. Grazing was totally eliminated from major Refuge riparian areas in the mid-1980s." But "[b]ecause of the extensive riparian areas, some negative

impact from livestock grazing still occurs to minor unfenced brooks, streams, and

wetlands." FWS also stated:

> Minor streams and brooks still experience bank de-stabilization and
> degradation from cattle impact, contributing to riparian area concerns.
> . . . [T]he stream values need to take precedence, and treatment of
> associated uplands needs to change to accommodate these concerns.
> Similarly, localized heavy impact can occur on areas deemed too
> sensitive to graze. Avoiding this would require undesired additional
> fencing and increased permittee attention.

70.    FWS admitted: "In some cases, the repetitive use of the same units in

the rest-rotation system can have effects similar to season-long grazing." FWS then

added: "It has been speculated that this may be leading to long-term changes in

present plant communities, although this is not well documented on this Refuge

due to staff and funding constraints."

71.    FWS stated that grazing can have beneficial effects too, but also

determined: "Grazing must be monitored, controlled and replanned to ensure the

desired effects are accomplished." In the 1994 EA, FWS also admitted: "Effective

use of grazing requires high levels of management by both permittees and Refuge

staff."

72.    On September 14, 1994, FWS signed a one-page Finding of No

Significant Impact (the "1994 FONSI"), selecting the 1994 EA's Alternative E, the

"Adaptive Management by Prescription Alternative." The selected alternative

allows grazing, but only with high levels of FWS management.

**The Adaptive Management Grazing Alternative Selected from the 1994 EA**

73.    In the 1994 EA, FWS described its selected alternative—Adaptive Management by Prescription—as follows: "[T]his alternative calls for defining a Desired Plant and Animal Community, refining objectives, developing annual prescriptions for habitat treatment, and selecting the appropriate management tools on an as needed basis."

74.    To ensure compatibility with Refuge goals, FWS determined that "several administrative changes to the existing [grazing] program are needed." FWS thus committed: "To implement adaptive management, prescriptions will be written before habitats are treated with a management tool. Monitoring will be more structured as part of this prescription. The process will require Refuge staff to plan, monitor, analyze, adjust, and replan for the following year, rather than rely on a pre-determined rest-rotation schedule." FWS also stated: "The approach will direct that the needs of wildlife be considered first and insure [sic] continued compatibility with the purpose of providing []refuge and breeding ground for wild birds and animals[]."

75.    FWS stated in the 1994 EA that the same amount of grazing (4,000–5,000 AUMs) will be allocated to permittees as before, but "the current three-pasture, rest-rotation system will be phased out as management by prescription is phased in," and new prescriptions "will call for shorter-duration, higher intensity

impact." FWS also committed: "Before manipulating an area, a brief, site-specific Prescribed Habitat Treatment Plan . . . will be prepared . . . . The prescription will require that Refuge staff undergo a thorough thought process before making a decision on whether to treat an area." FWS also stated: "The treatment plan will discuss the rationale, problem areas, and measures needed for successful treatment, including additional fence modifications for protection of riparian or other values."

76.     The 1994 EA includes a draft Site-specific Prescribed Habitat Treatment Plan, which calls for pre-treatment site evaluations along with details and parameters of the planned actions, contingency plans, funding and personnel, public coordination, criticisms, and post-treatment monitoring.

77.     FWS also committed to the following in the 1994 EA: (1) "A current ecological site and condition survey to revise the 1987 figures. This would provide an indication of the current status of the uplands. The survey would occur during the summer of 1995. . ."; (2) "Improving the inventory of Refuge lands and wildlife resources and assessing the results of combined effects treatment"; (3) "The preparation of a site or habitat management prescription before a treatment or tool is selected"; (4) "Increasing the flexibility of timing and use of management tools"; (5) "Annual evaluation of the objectives for various habitat types in order to refine them"; (6) "Follow-up monitoring to insure [sic] the prescription management plan is complete"; and (7) "Pre- and post-season consultation with

various entities, including the Montana Natural Heritage Program, the Montana

Riparian Association, Refuge grazing permittees, and others, to insure [sic] their

viewpoints are considered and needs met to the extent practicable."

78.    After issuing the 1994 EA and FONSI, FWS continued to authorize

grazing at the Refuge, but without following through on many of the requirements

and commitments made in the 1994 EA.

**The 2009 Comprehensive Conservation Plan and Grazing Compatibility
Determination**

79.    In June 2009 (nearly 15 years after releasing the 1994 EA), FWS

published the Comprehensive Conservation Plan, Red Rock Lakes National

Wildlife Refuge, MT (the "CCP"). One of the "key issues" FWS identified when

preparing the CCP was "inadequate monitoring of the current grazing program to

determine its effectiveness as a management tool."

80.    In the CCP, FWS also admitted that it had not carried out the grazing

plan and commitments it had made in the 1994 EA:

> Currently, the refuge has an Upland Management Plan that was
> written in 1994. The selected alternative was "Adaptive Management
> by Prescription." Although details of how this management alternative
> would be carried out are described, this plan was never fully
> actualized. The grazing program is currently run on what is a 3-year
> grazing unit rest-rotation cycle with very little monitoring of grazing
> impacts on habitats. In addition, fences have been removed or allowed
> to deteriorate, resulting in large units that preclude "short duration—
> high intensity" grazing as prescribed in the 1994 plan. Changes in the
> grazing program must take place in order for this to be an effective
> management tool for habitat manipulation and wildlife benefit.

81.     In the CCP, as in the 1994 EA and FONSI, FWS acknowledged the

threats grazing poses to the Refuge's values, and the challenges FWS would face

in addressing those threats. FWS admitted:

> [M]anagement of upland habitats adjacent to natural lakes (such as
> Upper and Swan lakes) and marshes could result in elevated levels of
> these nutrients [(nitrogen and phosphorus)] in the lakes. Elevated
> levels of phosphorus and nitrogen can lead to increases in algae and
> turbidity in shallow lakes, which may ultimately lead to significant
> losses of submerged aquatic vegetation communities . . . . In addition,
> the presence of livestock will be disturbing to some wildlife species
> and some visitors.

82.     FWS also admitted, "livestock grazing, both historic and current, has

had a detrimental effect on Arctic grayling spawning habitat by removing

vegetation and increasing sediment and nutrient loads, as well as trampling of

Arctic grayling eggs and fry in the stream gravels."

83.     FWS also determined that it may be difficult to meet habitat

objectives through the use of grazing if fences are not maintained and

acknowledged that "[m]aintenance of the fences is a constant effort due to weather,

water, animal, and human impacts." FWS also stated, "there are several streams

where the riparian habitats have been degraded due to overgrazing, but have not

been restored."

84.     FWS also admitted: "Current refuge staff and funding resources are

limited for the purposes of monitoring habitats and implementing research needs to

understand the impacts of grazing on refuge habitats."

85.    Nevertheless, FWS concluded that livestock grazing, if done properly, was compatible with the purposes of the Refuge. FWS decided "cattle grazing will continue to be used as a management tool in order to meet specific wildlife and habitat objectives and reduce invasive plants, enhance native species, and reduce hazardous fuels."

86.    In one part of the 2009 CCP, FWS listed six requirements to ensure that grazing was a compatible use of the Refuge: (1) maintaining existing riparian fences and using temporary fencing to protect habitats from cattle; (2) conducting a vegetation monitoring program to assess whether focal species habitat requirements are being met; (3) conducting a study to determine the impacts of cattle grazing on small-mammal populations; (4) beginning vegetation monitoring of shrub-steppe and grassland habitats to determine whether there is sufficient coverage of specific plant species; (5) monitoring the nutrient levels of Lower Red Rock, Upper Red Rock, and Swan lakes to prevent negative impacts to the lakes; and (6) monitoring and restricting grazing as necessary to minimize disturbances to nesting birds.

87.    FWS identified additional requirements and commitments throughout the CCP to ensure grazing is compatible with the Refuge's purposes, including: grazing "will only occur on the refuge to achieve specific habitat and wildlife objectives, and will include increased and improved oversight, monitoring, and

research (when appropriate) conducted to assess if management objectives are being met"; water-quality monitoring "will be conducted" to ensure grazing does not adversely affect Refuge lakes;  a vegetation monitoring program will be conducted to assess if target species habitat requirements are being met "within 5 years of CCP approval"; FWS will work with partners to conduct a range survey of the refuge to assess current range health and stocking rates; FWS will evaluate interior fences to determine their condition and effectiveness in managing grazing; and FWS will "[c]ooperate with BLM, The Nature Conservancy, and other partners to determine the effectiveness of prescribed fire and cattle grazing to create or maintain early seral habitats in suitable portions of the Centennial Sandhills within 5 years of CCP approval."

**Continued Grazing at the Refuge, and FWS's Issuance of Commercial Grazing CAAs and SUPs in 2023**

88.    Despite the commitments FWS made and the requirements set forth in both the 1994 EA and 2009 CCP, FWS has continued to allow grazing with little change, generally following pre-set rest-rotation cycles with minimal monitoring and without completing all promised studies or conducting annual evaluations, and otherwise falling far short of what FWS pledged to do and said was necessary for livestock grazing to be compatible with the purposes of the Refuge.

89.    On October 5, 2022, the five-year commercial SUPs expired for the five entities who had been authorized to graze livestock at the Refuge previously.

90.     In January 2023, FWS issued five CAAs and SUPs authorizing livestock grazing for the period of June 1, 2023, to October 31, 2027 to four of the same entities as before and to one new entity. Each CAA consists of a commercial SUP and an accompanying Plan of Operations, which outlines terms and conditions. Each Plan of Operations has what is called an "Annual Work Plan," which sets forth a rotational grazing schedule for the SUP for the next five years.

91.     The Annual Work Plans lack most features of the Site-specific Prescribed Habitat Treatment Plans called for in the 1994 EA. The Site-specific Prescribed Habitat Treatment Plan called for a pre-treatment site evaluation along with details and parameters of the planned actions, contingency plans, funding and personnel, public coordination, criticisms, and post-treatment monitoring, which are all to be part of the thorough thought process FWS was to engage in annually before deciding whether to even allow any grazing. The Annual Work Plans, by contrast, simply set forth the parameters of grazing that will be allowed for the next five years by assigning units to be grazed; setting on/off dates; providing approximate AUM rates; setting a rotational grazing schedule for units by year; and depicting a map of grazing areas.

92.     The Annual Work Plans do not mention pre-treatment site evaluations; adaptive management; past, ongoing, or future monitoring or

evaluation of livestock grazing effects; contingency plans; funding and personnel matters; or critiques of grazing.

93.     On January 31, 2023, WildEarth Guardians wrote to FWS, warning that the agency had failed to follow through on grazing program commitments and requirements from the 2009 CCP and that, as a result, neither FWS nor the public can gauge whether livestock grazing as being implemented at the Refuge has met or will meet the purposes of the Refuge. WildEarth Guardians notified FWS that the 2009 compatibility determination for grazing at the Refuge had expired in 2019. WildEarth Guardians also urged FWS to prepare an EIS, or at least an EA, evaluating grazing's impacts and considering alternatives prior to permitting grazing at the Refuge in 2023.

94.     Later in 2023—after having already issued the CAAs and SUPs—FWS tried to bolster its decision to re-authorize grazing by issuing an Environmental Action Statement and a Compatibility Determination regarding continued grazing at the Refuge.

**The 2023 Environmental Action Statement**

95.     Instead of preparing an EIS or an EA, FWS issued a one-page Environmental Action Statement on May 30, 2023. In the Environmental Action Statement, FWS included a single written paragraph stating it "determines all scientific conclusions, biological premises, and historical observations contained in

the 1994 Environmental Assessment . . . to still be factual, relevant, and appropriate insofar as it relates to the grazing program." FWS added: "The EA's preferred action of adaptive management by prescription continues to be an appropriate habitat management tool in concert with its finding of no significant impact." FWS also asserted that the 2009 CCP "concurs with the EA's findings."

96.     In the Environmental Action Statement, FWS never considered whether grazing authorized in 2023 is substantially the same as the actions covered in the 1994 EA, which it is not. The 2023 SUPs follow a preset rest-rotation grazing schedule, instead of requiring annual assessment through a Site-specific Prescribed Habitat Treatment Plan. And the SUPs otherwise fail to follow the specific measures set forth in the 1994 EA that require Refuge staff to plan, monitor, adjust, replan for the following year, study the Refuge, consult with various entities, and go through a thorough thought process before making a decision on whether to graze an area.

97.     FWS also failed to cite to or reference any studies or information in its Environmental Action Statement, other than the 14-year-old CCP. FWS failed to mention that the 2009 CCP found that FWS had failed to follow through on the important commitments made for the grazing program in the 1994 EA, and that FWS needed to correct course and change the grazing program.

98.     In the Environmental Action Statement, FWS also failed to evaluate whether any new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different effects from what it found three decades earlier in the 1994 EA. New circumstances and new information since 1994 include the effects of climate change, new or growing infestations of invasive species, deteriorating water quality and aquatic habitat, plummeting arctic grayling populations, the decline of the greater sage-grouse and designation of its core habitat at the Refuge, the increased presence of grizzly bears and risks of conflict, changes to livestock fencing, and other new circumstances and information at the Refuge that were never considered by FWS.

99.     FWS never analyzed or disclosed the lack of monitoring and studies, and it is not known what condition many habitats at the Refuge are currently in, how they compare to those in 1994, and what their trends are, including for target bird species. FWS also never considered staff and budget limitations and other administrative realities making FWS unable to carry out its grazing program, limitations proven by history and admitted in other FWS documents from 1994 to the present. And FWS never considered changes to the action approved in the 1994 EA, including that it was now abandoning the Site-specific Prescribed Habitat Treatment Plans and related processes to ensure any grazing is carefully monitored, planned, and adjusted annually.

**The 2023 Compatibility Determination**

100.   On May 31, 2023, FWS released for a 14-day public comment period a draft Compatibility Determination for livestock grazing on the Refuge to update and replace the compatibility determination in the 2009 CCP.

101.   On June 14, 2023, WildEarth Guardians submitted comments to FWS on the draft Compatibility Determination, urging FWS to prepare an EIS or EA for any continued grazing; warning that livestock grazing without sufficient monitoring and corrective action, and without sufficient administrative means for FWS to ensure proper management, is not a compatible use; and warning that FWS failed to consider effects of grazing on the Refuge's uniquely important and plummeting populations of arctic grayling.

102.   On June 30, FWS issued the new compatibility determination (the "2023 Compatibility Determination"), to replace the 2009 compatibility determination, and dismissed WildEarth Guardians' concerns. FWS settled on three stipulations as necessary to ensure grazing is compatible with the Refuge's purposes: (1) grazing will be conducted in accordance with the SUPs; (2) FWS will implement periodic vegetation monitoring as set forth in the CCP to assess species composition and whether habitat requirements are being met; and (3) existing riparian fences will be maintained, and wildlife-friendly, drop, and temporary fencing will be used as needed to protect riparian habitats from cattle.

103.   To describe fish, wildlife, and plants that occur in or use that habitat that will be grazed, FWS simply stated: "Elk, deer, rodents, foxes, coyotes, birds of prey, migratory and grassland nesting birds are periodically present in these areas." In the "Anticipated Impacts of the Use" section of the 2023 Compatibility Determination, FWS admitted that grazing can disturb wildlife and public users and that trampling vegetation will occur. But FWS mostly touted the supposed benefits of grazing and asserted that "[m]inimal negative impacts . . . are expected." FWS never mentioned arctic grayling or grizzly bear, and barely mentioned sage-grouse. FWS never mentioned climate change and invasive species. Despite stating that riparian fencing needs to be maintained, the Compatibility Determination contains no discussion of grazing impacts to riparian habitat, water quality, and grayling, and no information or assessment of past, current, or future ability to successfully exclude cattle from riparian areas at the Refuge; nor assessment of the tradeoff of impacts of fencing on wildlife, habitat, and wilderness characteristics.

104.   In the 2023 Compatibility Determination, FWS relied on 2005–2007 field surveys for vegetation, referencing no new Refuge vegetation data from the past 16 years.

105.   FWS also purported to rely on the 2009 CCP to justify grazing at the Refuge, stating that the "CCP has established goals and objectives for specific

habitat types . . . where prescribed grazing may be utilized." FWS, however, failed to acknowledge that the 2009 CCP determined that FWS had failed to implement the grazing program adopted in the 1994 EA, and that changes to the grazing needed to be made for it to be a compatible use. FWS also never mentioned the many goals, objectives, commitments, and requirements in the 1994 EA and 2009 CCP that it has yet to carry out.

106.   In the 2023 Compatibility Determination, FWS did commit to vegetation monitoring: "[B]eginning in the summer of 2023, the Refuge is embarking on a comprehensive periodic vegetation monitoring program that includes a bird monitoring component." FWS admitted this information will provide Refuge staff "information needed to make informed wildlife and habitat decisions." But other than this, FWS made no commitments to follow through on other components of the grazing program.

107.   The 2023 Compatibility Determination includes a section on "Availability of Resources." There, FWS described its staffing for grazing and touts that the Refuge expects to continue these staffing practices into the future. Yet, FWS failed to acknowledge its chronic understaffing and its failures for decades to follow through on the many grazing program requirements in the 1994 EA and the 2009 CCP to monitor, study, and carefully adapt and plan grazing at the Refuge.

## FIRST CLAIM FOR RELIEF
### FWS's Issuance of CAAs and SUPs Violates the Refuge Act's Consistency Requirement and the APA

108.    Plaintiffs reallege and incorporate by reference the allegations above.

109.    This first claim for relief challenges FWS's violations of the Refuge Act and its implementing regulations by issuing each of five Cooperative Agriculture Agreements and Commercial Special Use Permits authorizing livestock in Red Rock Lakes NWR without complying with the 2009 Comprehensive Conservation Plan. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

110.    The Refuge Act requires that FWS "shall manage the refuge . . . in a manner consistent with the plan." 16 U.S.C. § 668dd(e)(1)(E). When it issued the five CAAs and SUPs in 2023 authorizing livestock grazing at Red Rock Lakes NWR, FWS failed to act consistently with the 2009 CCP by failing to comply with the following grazing program requirements:

   a.   The grazing program will no longer be on a 3-year grazing unit rest-rotation schedule with little monitoring;

   a.   Grazing will only occur to achieve specific beneficial habitat and wildlife objectives;

   b.   Grazing will include increased and improved oversight, monitoring, and research to assess whether objectives are being met;

   c. Evaluations will occur annually to decide whether grazing is necessary in any areas;

   d. Monitoring and restricting grazing will occur to minimize disturbances to nesting birds;

   e. Monitoring water quality will occur to ensure grazing is not adversely affecting lakes at the Refuge;

   f. A vegetation monitoring program will be conducted to assess whether focal species habitat requirements are being met;

   g. Vegetation monitoring of shrub-steppe and grassland habitats will occur to determine whether there is sufficient coverage of specific plant species; and

   h. A range survey of the refuge will occur to assess current range health and stocking rates.

FWS also failed to acknowledge these requirements and failed to offer any explanation as to why it was deviating from them when it issued the CAAs and SUPs.

111. Accordingly, FWS's issuance of the CAAs and SUPs is arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

     WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
### FWS's Issuance of CAAs and SUPs Violates the Refuge Act's Compatibility Requirement and the APA

112.    Plaintiffs reallege and incorporate by reference the allegations above.

113.    This second claim for relief challenges FWS's violation of the Refuge Act and its implementing regulations by issuing each of five Cooperative Agriculture Agreements and Commercial Special Use Permits authorizing livestock in Red Rock Lakes NWR relying on the 2023 Compatibility Determination. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

114.    The Refuge Act and its regulations mandate that FWS shall not allow any use of a refuge "unless [FWS] has determined that the use is a compatible use." 16 U.S.C. § 668dd(d)(3)(A); *see also* 50 C.F.R. § 25.21(b). A compatibility determination must "[d]escribe the specific areas of the refuge that will be used: habitat types and acres involved [and] key fish, wildlife, and plants that occur in or use that habitat." 603 FW § 2.12(A)(6)(b). FWS must consider direct impacts of the use, indirect impacts associated with the use, and cumulative impacts including "uses of adjacent lands or waters that may exacerbate the effects of a refuge use." U.S. Fish and Wildlife Service Manual, 603 FW §§ 2.11(B)(3), 2.12(A)(8)(c). Uses that are reasonably anticipated "to reduce the quality or quantity or fragment habitats on a national wildlife refuge will not be compatible." *Id.* § 2.5(A).

115.    FWS's issuance of the CAAs and SUPs in 2023 to authorize livestock grazing by relying on the 2023 Compatibility Determination failed to comply with the Refuge Act and FWS regulations and policies for multiple reasons, including because in the 2023 Compatibility Determination:

a.  FWS relied on outdated vegetation data and other data, and failed to gather or utilize other information needed to assess compatibility;

b.  FWS failed to adequately describe areas to be grazed and key fish, wildlife, and habitat that occur there;

c.  FWS failed to consider all direct, indirect, and cumulative impacts of grazing;

d.  FWS ignored many requirements that it previously determined in the 1994 EA and 2009 CCP were necessary for grazing to be compatible, and/or failed to explain why these requirements are no longer necessary; and

e.  FWS failed to consider its limited capacity to carry out the commitments it makes in the 2023 Compatibility Determination.

116.    Accordingly, FWS's issuance of the CAAs and SUPs by relying on the 2023 Compatibility Determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
**FWS's 2023 Environmental Action Statement Violates NEPA & the APA**

117.   Plaintiffs reallege and incorporate by reference the allegations above.

118.   This third claim for relief challenges FWS's violations of NEPA and its implementing regulations when it issued each of five Cooperative Agriculture Agreements and Commercial Special Use Permits authorizing livestock grazing in Red Rock Lakes NWR and issued the June 30, 2023 Environmental Action Statement, which in turn relied on the 1994 EA and refused to prepare a new NEPA document. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

119.   CEQ NEPA regulations allow new actions to be covered by an existing EA if the actions covered by the original EA and the proposed action are "substantially the same." 40 C.F.R. § 1506.3(c). Interior regulations allow using an existing EA if FWS determines "with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action." 43 C.F.R. § 46.120(c). "The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.*

120.    FWS's issuance of the CAAs and SUPs and issuance of the 1-page Environmental Action Statement failed to comply with NEPA and NEPA regulations for multiple reasons, including:

a.  The grazing authorized by the SUPs is not substantially the same as the actions covered in the 1994 EA;

b.  Other than referencing the 14-year-old CCP from 2009, the Environmental Action Statement does not include or reference any supporting documentation for its determination that the 1994 EA adequately assesses the environmental effects of the grazing authorized by the SUPs; and

c.  FWS failed to evaluate any of the new circumstances and new information regarding the Refuge and grazing impacts, and failed to evaluate whether any changes in the grazing program or its impacts not previously analyzed may result in significantly different direct, indirect, and cumulative effects from what it found in the 1994 EA.

121.    Accordingly, FWS's issuance of the five CAAs and SUPs based on the Environmental Action Statement is arbitrary, capricious, an abuse of discretion, and not in accordance with law and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**FWS's Failure to Prepare an EIS Violates NEPA & the APA**

122.   Plaintiffs reallege and incorporate by reference the allegations above.

123.   This fourth claim for relief challenges FWS's violations of NEPA and its implementing regulations by issuing five Cooperative Agriculture Agreements and Commercial Special Use Permits in 2023 authorizing livestock grazing in Red Rock Lakes NWR without first preparing an EIS. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

124.   If a major federal action may have significant impacts, an agency must prepare an EIS. 42 U.S.C. §§ 4321, 4332(2)(C). Agencies must consider short-term and long-term direct, indirect, and cumulative effects, including ecological, aesthetic, historic, cultural, economic, social, or health effects. *See* 40 C.F.R. § 1501.3(b)(2), (g). An agency can avoid preparing an EIS only if it determines based on the EA that the proposed action "will not have significant effects." *Id.* § 1501.6(a).

125.   FWS's authorization of grazing is a major federal action which may have significant impacts and requires preparation of an EIS prior to issuing CAAs and SUPs, for many reasons, including:

     a.   Current conditions and trends for numerous environmental factors at the Refuge, as well as the direct, indirect, and cumulative impacts from past and authorized livestock grazing on those conditions and

trends, are highly uncertain because of FWS's longstanding failure to

monitor and study them, and these impacts may be significant; and

b.  Direct, indirect, and cumulative impacts from livestock grazing

authorized by the SUPs, and from other past, present, and reasonably

foreseeable future actions on and off the Refuge have caused and will

cause degraded water quality and aquatic habitat; declining arctic

grayling populations at the Refuge; disturbance of wildlife and

degradation of wildlife habitat at the Refuge, including for at-risk,

special-status species like grizzly bear, sage-grouse, and target bird

species at the Refuge; and degradation of wilderness values in

designated wilderness areas within the Refuge.

126.  Accordingly, FWS's issuance of the CAAs and SUPs without

preparing an EIS was arbitrary, capricious, an abuse of discretion, and not in

accordance with law, and must be set aside under the APA, 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs WildEarth Guardians and Western Watersheds

Project respectfully request that this Court grant the following relief:

A.  Order, declare, and adjudge that FWS's 2023 Cooperative Agriculture

Agreements and Special Use Permits, 2023 Compatibility Determination, and 2023

Environmental Action Statement authorizing livestock grazing in Red Rock Lakes NWR are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, the Refuge Act, and NEPA;

B.    Vacate, set aside, reverse, and remand the 2023 Cooperative Agriculture Agreements and Special Use Permits, the 2023 Compatibility Determination, and the 2023 Environmental Action Statement;

C.    Order FWS to prepare an EIS, or at least an EA, before authorizing grazing at the Refuge;

D.    Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereafter seek; and

E.    Award Plaintiffs their reasonable costs, litigation expenses, and attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and all other applicable authorities.

Dated this 14th day of May, 2024.          Respectfully submitted,

*/s/ Andrew Hursh*
Andrew Hursh
*/s/ Bryan Hurlbutt*
Bryan Hurlbutt

*Attorneys for Plaintiffs*